UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Edward Mark Sunshine

    v.                                        Civil No. 16-cv-446-LM
                                                  Opinion No. 2018 DNH 017
Nancy A. Berryhill, Acting
Commissioner of Social Security[1]


**O R D E R**

Edward Mark Sunshine seeks judicial review, pursuant to 42
U.S.C. § 405(g), of the decision of the Acting Commissioner of
the Social Security Administration, denying, in part, his
application for social security disability benefits.  Sunshine
moves to reverse the Acting Commissioner's decision that he was
no longer disabled as of October 4, 2013, contending that the
Administrative Law Judge ("ALJ") erred in his assessment of
Sunshine's residual functional capacity by improperly evaluating
and weighing the medical evidence and not crediting Sunshine's
subjective complaints.  He also argues that the ALJ erred by
relying on the vocational expert's response to hypotheticals
that did not match his residual functional capacity assessment.
For the reasons that follow, the decision of the Acting
Commissioner is affirmed.

---

[1] Nancy A. Berryhill became Acting Commissioner of the Social
Security Administration on January 23, 2017, replacing Carolyn
W. Colvin.  See Fed. R. Civ. P. 25(d).

**STANDARD OF REVIEW**

In reviewing the final decision of the Acting Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The court defers to the ALJ's factual findings as long as they are supported by substantial evidence. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).

In determining whether a claimant is disabled, the ALJ follows a five-step sequential analysis. 20 C.F.R. § 404.1520. The claimant bears the burden through the first four steps of proving that his impairments preclude his from working.[2] Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the Acting Commissioner has the burden of showing that jobs exist which the claimant can do. Id.

"If the claimant is found disabled at any point in the process, the ALJ must also determine if his disability continues

---

[2] The first four steps are (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether he has a severe impairment; (3) determining whether the impairment meets or equals a listed impairment; and (4) assessing the claimant's residual functional capacity and his ability to do past relevant work. 20 C.F.R. § 404.1520(a).

through the date of the decision." Nardolillo v. Astrue, No. CA 09-603 S, 2011 WL 1532147, at *3 (D.R.I. Mar. 29, 2011), report and recommendation adopted sub nom. Nardilillo v. Astrue, No. CA 09-603 S, 2011 WL 1692162 (D.R.I. Apr. 21, 2011) (internal quotation marks, citation, and alterations omitted). Relevant to this case, to terminate benefits after a disability has been found, substantial evidence must demonstrate that there has been medical improvement to the point that the claimant is able to engage in substantial activity. See, e.g., Shirzay v. Astrue, No. CIV.A. 10-11661-JLT, 2012 WL 397897, at *5 (D. Mass. Jan. 19, 2012), report and recommendation adopted, No. CIV.A. 10-11661-JLT, 2012 WL 397970 (D. Mass. Feb. 6, 2012). Medical improvement is defined as "any decrease in the medical severity of [an] impairment" determined by "changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the] impairment." 20 C.F.R. § 404.1594(b)(1).

## BACKGROUND

On August 26, 2013, Edward Sunshine applied for social security disability benefits, claiming a disability that began on July 25, 2012, when he was in a motorcycle accident. Sunshine alleged that he was disabled because of a concussion, vertigo, left arm fractures, right leg fracture, blurred vision, loss of memory, confusion, migraine headaches, loss of feeling

and coordination in his left hand and a limp.  Sunshine was 49 years old at the time of his application.  He had previously worked as a scientist, carpenter, roofer, small business owner, hot dog vendor, and "house flipper."

After his accident, Sunshine spent three days in the hospital recovering from his injuries.  He fractured several bones and underwent surgery.  In the months following the accident, Sunshine sought treatment for vertigo and headaches, as well as for the various physical injuries he sustained during the accident.  Sunshine continued to seek treatment for his ailments at least through March 2015.

On May 14, 2015, a hearing before an ALJ was held on Sunshine's application for benefits.  Sunshine was represented by an attorney and testified at the hearing.

On June 19, 2015, the ALJ issued a partially favorable decision.  The ALJ found Sunshine had not engaged in substantial gainful activity from his July 25, 2012 alleged onset date through the decision date.  At Step Two, the ALJ found Sunshine had the following "severe" impairments after the alleged onset date, significantly limiting his ability to do basic work-related activities: "status-post surgical repair of left olecranon, radial, and 5th metacarpal fractures; status-post right patellar fracture and surgical repair of right thigh

laceration; post-concussion syndrome with vestibulopathy; and
obesity."  At Step Three, the ALJ found Sunshine had no
impairments that met or equaled any of the listed impairments at
20 C.F.R. Part 404, Subpart P, Appendix 1 at any time from the
alleged onset date through the decision date.  The ALJ then
found that Sunshine had the following residual functional
capacity ("RFC") from the July 25, 2012 alleged onset date
through October 3, 2013:

> [T]he claimant had the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b)
> except that he could never crawl or climb ladders,
> ropes or scaffolds; could only occasionally climb
> ramps and stairs, balance, stoop, kneel, and crouch;
> could only occasionally perform foot control
> operations; could only occasionally reach and never
> overhead reach with the non-dominant left upper
> extremity; could only occasionally engage in handling
> and fingering with the non-dominant left upper
> extremity; needed to avoid exposure to extreme cold,
> moving machinery, and unprotected heights; would have
> missed more than 3 days of work a month; and would
> have been off-task up to 20% of the workday.

The ALJ found that, for the period from July 25, 2012 through
October 3, 2013, Sunshine could not do any past relevant work
and that no jobs existed in significant numbers that he could do
with the assessed RFC.  The ALJ thus concluded Sunshine was
disabled from July 25, 2012, through October 3, 2013.

The ALJ determined that as of October 4, 2013, medical
improvement related to Sunshine's ability to work occurred.  For

the period from October 4, 2013, through the June 19, 2015

decision date, the ALJ assessed the following RFC:

> [T]he claimant has had the residual functional
> capacity to perform light work as defined in 20 CFR
> 404.1567(b) except that he can never crawl or climb
> ladders, ropes, or scaffolds; can only occasionally
> climb ramps and stairs, balance, stoop, kneel, and
> crouch; can only occasionally perform foot control
> operations with the right lower extremity; can
> frequently reach and occasionally overhead reach with
> the non-dominant left upper extremity; can frequently
> engage in handling and fingering with the non-dominant
> left upper extremity; must avoid exposure to extreme
> cold, moving machinery on the work floor, unprotected
> heights, and very loud noises; and must avoid exposure
> to fluorescent lights or be permitted to wear
> sunglasses in the workplace.

The ALJ then found that Sunshine could do past relevant work as

a small business owner and mail order clerk.[3]  The ALJ also found

in the alternative that Sunshine could do other jobs existing in

significant numbers in the economy.

Accordingly, the ALJ found Sunshine was not disabled

starting October 4, 2013, through the June 19, 2015 decision

date.  The Appeals Council denied Sunshine's request for review,

making the ALJ's decision the Acting Commissioner's final

decision.

---

[3] In the Joint Statement of Material Facts, mail order clerk
is not listed as one of Sunshine's previous jobs.  The parties
do not make any reference to this inconsistency and it is not
relevant to the court's analysis.

**DISCUSSION**

Sunshine contends that the ALJ erred in his assessment of Sunshine's residual functional capacity as of October 4, 2013, by ignoring and/or improperly discounting his treating physician's opinion and by disregarding Sunshine's own testimony as to his symptoms. He also argues that the ALJ erred at Step Five when he found that Sunshine could do jobs existing in significant numbers in the economy.

I. RFC Assessment as of October 4, 2013

A claimant's RFC is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ is responsible for determining a claimant's RFC based on all relevant evidence in the record. Id.; see Dimambro v. US Soc. Sec. Admin., Acting Comm'r, No. 16-cv-486-PB, 2018 WL 301090, at *4 (D.N.H. Jan. 5, 2018). In making that determination, the ALJ is responsible for resolving any conflicts in the evidence. See Gonzalez Garcia v. Sec'y of Health & Human Servs., 835 F.2d 1, 3 (1st Cir. 1987). The ALJ is further required to evaluate "every medical opinion" that a claimant submits, "[r]egardless of its source." 20 C.F.R. § 404.1527(c).

The ALJ determined that Sunshine's RFC improved beginning on October 4, 2013.[4]  In making that determination, the ALJ gave consideration to Sunshine's own testimony and his October 3 function report.  For example, the ALJ noted that although Sunshine testified that he continued to have "significant problems with his left upper extremity and right lower extremity," he had not seen a physician or sought any treatment for those injuries at all after 2013.  The ALJ also noted that Sunshine's physical therapy notes from 2013 stated that he had greater strength and functional capacity than he described at the hearing and that despite his claims of extreme pain in those areas, he had not been prescribed any pain medications other than medical marijuana, which was prescribed for other reasons.  The ALJ further noted that Sunshine was offered another course of physical therapy for his physical ailments in March 2015, but he declined.

The ALJ also discussed Sunshine's testimony concerning his severe headaches, noting that his "treatment and demonstrated activities are not consistent" with his complaints.  The ALJ noted that Sunshine had only seen his treating neurologist, Dr.

_____

[4] The date of improvement corresponds to a function report Sunshine completed on October 3, 2013 in which the ALJ stated that Sunshine "reported excellent activities of daily living." Admin. Rec. at 28.

Anthony Knox, three times since mid-2013 (in March 2014, July 2014, and March 2015), and that his headaches had been most recently characterized as simple muscle tension headaches and not migraines.  The ALJ also referenced that Dr. Knox had prescribed Lopressor as a prophylactic headache medication in March 2014, but that Sunshine discontinued the medication and had not sought further treatment, despite it being offered to him.

In addition to Sunshine's lack of treatment, the ALJ also discussed how Sunshine's "alleged severity of [his] impairments are also inconsistent with his ability to maintain a wide variety of activities of daily living, indicative of significant functional capacity."  Admin. Rec. at 32.  For example, the ALJ cited Sunshine's October 3, 2013 function report, where Sunshine stated that he can perform self-care tasks such as dressing, bathing, grooming, and can adequately manage household chores, doing laundry, going grocery shopping, driving, and caring for his dog.  Sunshine also testified at the hearing that he hand-washes his dishes, prepares simple meals, and goes for walks during the day and sometimes at night to get exercise.

The ALJ further discussed evidence in the record regarding Sunshine's work activity.  He noted Sunshine's testimony that he had purchased a home in late-2013 in order to engage in the

business of "flipping" houses, and that Sunshine had reported in March 2014 that he had made several efforts to return to work as a painter and doing construction tasks.  Although Sunshine stated that he lacked the "stamina to do the work," the ALJ found that Sunshine's attempts to do such work undercut Sunshine's testimony concerning his allegedly severe limitations.  Sunshine also never attempted a lighter job that did not entail such strenuous activity.

In addition to Sunshine's own testimony, the ALJ supported his RFC assessment with medical opinion evidence.  The ALJ gave great weight to the opinion of Dr. Louis Rosenthall, a state agency physician, who did not examine Sunshine but reviewed his medical records.  Dr. Rosenthall opined that Sunshine could do light work with certain limitations as of October 2013, and the ALJ noted that those limitations were consistent with Sunshine's continued complaints of dizziness and with Sunshine's improvement and lack of recent treatment relating to his musculoskeletal injuries.  The ALJ also discussed the opinion of Dr. Stefanie Griffin, a state agency psychologist, who examined Sunshine in December 2013.[5]  Dr. Griffin's exam "revealed mostly average cognitive functioning," which did not support Sunshine's claimed limitations.  Dr. Griffin opined that based on her exam,

---

[5] The ALJ inadvertently referred to Dr. Griffin as Dr. Green.

Sunshine was capable of adhering to a work schedule and making basic work-related decisions.  In addition, the ALJ discussed the January 2014 opinion of the state agency psychologist, Dr. Laura Landerman, who reviewed Sunshine's records and opined that he had no medically determinable mental impairments.

Sunshine does not challenge the ALJ's reliance on the opinion evidence of Drs. Rosenthall, Griffin, or Landerman.  He claims, however, that the ALJ's RFC assessment is not supported by substantial evidence because it ignores the opinion of Dr. Knox, Sunshine's treating neurologist, and disregards his own testimony.

A.  Treating Physician's Opinion

Medical opinions are evaluated based on the nature of the medical source's relationship with the claimant, the consistency of the opinion with the other record evidence, the medical source's specialty, and other factors that may be brought to the ALJ's attention.  § 404.1527(c).  A treating medical source's opinion about the claimant's impairment will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  § 404.1527(c)(2).  An ALJ must give "good reasons" for the weight given to a treating source's medical

opinion.  § 404.1527(c)(2).  "Those reasons must offer a
rationale that could be accepted by a reasonable mind."
Dimambro, 2018 WL 301090, at *10.  If the ALJ satisfies that
standard, the court will uphold the decision to discount a
treating source's opinion.  Id.

Sunshine notes that the ALJ found that Sunshine had the
same severe impairments before and after October 4, 2013, but
that the ALJ concluded that the medical record showed an
increase in Sunshine's residual functional capacity as of that
date.  Sunshine contends that in making this determination, the
ALJ "largely ignored and/or improperly discounted" the medical
records of Sunshine's treating neurologist, Dr. Knox.  He cites
several of Dr. Knox's medical records, including (1) "Visit
Notes" from Dr. Knox from various points in 2013 and 2014 and
(2) Dr. Knox's February 25, 2014 "Treating Source Statement –
RFC."  Although Sunshine concedes that the ALJ explained his
reasoning for discounting Dr. Knox's opinions concerning
Sunshine's limitations as of October 4, 2013, he contends that
the ALJ's reasoning is merely "conjecture" and not supported by
the evidence.

In assessing Sunshine's residual functional capacity, the
ALJ considered Dr. Knox's descriptions of Sunshine's "extreme
work-related limitations" in his Treating Source Statement.  The

12

ALJ gave Dr. Knox's opinions little weight for several reasons. First, the ALJ referred to Sunshine's own testimony and his 2013 Function Report, discussed above, in which he discussed his activities of daily living and his attempts to return to work. The ALJ found that Sunshine's own descriptions were at odds with Dr. Knox's opinion that Sunshine was limited to "less than sedentary work." Such a basis supports a finding that the ALJ had "good reasons" to discount a treating physician's opinion. See, e.g., Dimambro at *11 (noting ALJ's discounting of treating physician's opinion because it was inconsistent with evidence of claimant's "ongoing levels of activity" was a "good reason" for assigning it less than controlling weight) (citing cases)).

Second, the ALJ discussed Sunshine's lack of treatment and need for prescription pain medication post-October 3, 2013, which the ALJ determined did not support the significant limitations set forth in Dr. Knox's Treating Source Statement. Such evidence can further be considered "good reasons" for giving little weight to a treating physician's activities. See, e.g., Kane v. Astrue, No. CIV. 08-271-B-W, 2009 WL 902068, at *3 (D. Me. Mar. 31, 2009), report and recommendation adopted, No. CIV 08-271-B-W, 2009 WL 1080644 (D. Me. Apr. 21, 2009) (noting that ALJ properly gave treating physician's opinion that claimant was severely limited little weight in light of the

"claimant's minimal treatment history [and] his lack of need for prescription pain medication").

Finally, the ALJ noted that Dr. Knox's opinions were at odds with the three state agency physicians' opinions.  Although an ALJ is directed generally to give the greatest weight to medical opinions for treating sources, "the regulations also presuppose that nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record."  Maynard v. Colvin, No. 14-cv-512-LM, 2015 WL 5838319, at *7 (D.N.H. Oct. 7, 2015) (citing cases); see also Otero v. Colvin, No. 14-cv-206-PB, 2015 WL 5089810, at *3 (D.N.H. Aug. 27, 2015) ("opinions of treating physicians are not entitled to greater weight merely because they were treating physicians." (internal quotation marks and citation omitted)). Here, in light of the evidence discussed above, there is sufficient support in the record to discount Dr. Knox's opinion while crediting the non-treating physicians' opinions.  See, e.g., Otero, 2015 WL 5089810, at *4 (noting ALJ properly gave treating physician's opinion little weight in part because non-examining physician credibly opined that claimant did not have severe limitations).

Sunshine asserts that the ALJ's rationale as to why he gave these opinions little weight after giving Dr. Knox's pre-October

4, 2013 opinions great weight "is erroneous and constitutes reversible error." That is simply not the case. As explained above, while Sunshine labels the ALJ's reasoning as "conjecture," the ALJ addressed Dr. Knox's conclusions and reasonably explained why he gave them little weight. A "reasonable mind" could accept the ALJ's reasons, and Sunshine has not shown any error in that analysis.[6] See, e.g., Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam) (affirming ALJ's decision which gave claimant's treating physicians' opinions little weight because the court "must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

---

[6] Sunshine criticizes the ALJ's statement that Dr. Knox's notes "give the impression that he overly sympathizes with or may have even exaggerated the claimant's complaints with no consideration to their validity." Admin. Rec. at 33. This comment, while unhelpful, does not undermine the ALJ's decision to give Dr. Knox's post-October 3, 2014 opinions little weight given the otherwise thorough explanation. See, e.g., Hill v. Astrue, No. CIV.A. 12-30018-KPN, 2012 WL 5830707, at *4 (D. Mass. Nov. 15, 2012) (noting that ALJ's speculation that providers sometimes assist patients in applications for disability benefits out of sympathy "was unnecessary and unhelpful to the determination of disability," but finding ALJ's decision to give treating physician's opinion limited weight was appropriate).

B.  <u>Subjective Complaints</u>

It is the responsibility of the ALJ to determine whether the claimant's description of his symptoms is credible. [Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)](). When reviewing an ALJ's credibility determination, the court defers to the ALJ because he "observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence." [Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)](). "It is the ALJ's prerogative to resolve conflicting evidence, and [the court] must affirm such a determination, even if the record could justify a different conclusion so long as it is supported by substantial evidence." [Vazquez-Rosario v. Barnhart, 149 F. App'x 8, 10 (1st Cir. 2005)]() (internal quotation marks and citation omitted); see also [Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)]().

Sunshine argues that the ALJ erred in disregarding his testimony about his impairments. Contrary to Sunshine's claim, however, as discussed above, the ALJ spent significant time addressing Sunshine's subjective complaints as of October 4, 2013. Specifically, the ALJ discussed Sunshine's complaints regarding his left upper extremity and right lower extremity. The ALJ determined these complaints were not credible in light

of Sunshine's lack of treatment or medical appointments after 2013, his daily activities, his physical therapy notes that showed improvement, his lack of pain medication, and the fact that he declined further physical therapy in 2015.  See Section I, supra.  The ALJ also discussed Sunshine's testimony concerning his severe headaches, discounting them for similar reasons.  See id.  In light of the other evidence in the record, the ALJ found that Sunshine's subjective complaints were "exaggerated," "generally not credible" and "not persuasive." Admin. R. at 29.

The ALJ provided a thorough analysis to support his conclusion that Sunshine's statements concerning the severity and limiting effect of his symptoms as of October 4, 2013 were not credible.  The ALJ's conclusion falls squarely within his discretion.  See Frustaglia, 829 F.2d at 195 ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."); see also Conde v. Colvin, No. 15-cv-246-JD, 2016 WL 299017, at *5 (D.N.H. Jan. 25, 2016).

II.  Step Five Determination

At Step Five of the continuing disability analysis, the ALJ has the burden of showing that jobs exist in the economy which the claimant can do in light of his RFC assessment.  A vocational expert's opinions about jobs provides substantial evidence to support the ALJ's disability determination if the opinions are based on hypothetical questions that accurately reflect the claimant's limitations.  See Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 447 (1st Cir. 1991); Otero, 2015 WL 5089810, at *6.

Sunshine contends that the ALJ erred at Step Five when he determined that a significant number of jobs exist in the national economy that Sunshine can do.  He raises several challenges to the vocational expert's testimony, upon which the ALJ relied in his Step Five determination.  Specifically, Sunshine asserts: (1) the ALJ failed to resolve the conflicts between the vocational expert's testimony and information in the Dictionary of Occupational Titles ("DOT"); (2) the vocational expert's testimony was "confused, confusing, and contradictory,"; and (3) the vocational expert's testimony was based on hypotheticals that did not take into account all the medical evidence in the record.

A.   Conflicts with DOT Information

Sunshine points to a number of purported inconsistencies between the vocational expert's testimony and information in the DOT.  He notes that the vocational expert identified a specific number of jobs available and testified about the extent to which that number would be reduced with additional limitations in response to certain hypotheticals posed by the ALJ.  He also faults the vocational expert's testimony regarding light sensitivity limitations and the impact of accommodations for Sunshine to wear sunglasses and hats at work on the number of available jobs.  Sunshine contends that the vocational expert's testimony on these issues was inconsistent with the information contained in the DOT.

Sunshine's arguments are misplaced.  Although the ALJ "must elicit a reasonable explanation for" an unresolved conflict between a vocational expert's testimony and the DOT, SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. 2000), Sunshine has not shown that a conflict existed here.  The DOT does not provide the number of jobs available for particular occupations or reduce the number of available jobs based on certain specific limitations.  See Godin v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 16-cv-461-PB, 2017 WL 5515845, at *6 (D.N.H. Nov. 16, 2017) ("The DOT . . . just defines jobs. It does not report how many

such jobs are available in the economy." (internal quotation marks, citations, and alterations omitted)).  Therefore, the vocational expert's testimony concerning the impact of certain limitations on the availability of jobs in the national economy does not conflict with the DOT.  See Szumylo v. Astrue, 815 F. Supp. 2d 434, 441 (D. Mass. 2011) ("Because the Dictionary of Occupational Titles does not address the subject of sit/stand options, it is not apparent that the testimony referencing such an option conflicts with it." (internal quotation marks, citation, and alterations omitted)).  For these reasons, the ALJ did not run afoul of his obligations to resolve conflicts between a vocational expert's testimony and the DOT.  Id.

    B.    Confusing Testimony

    Sunshine also points to the vocational expert's testimony concerning the ALJ's hypotheticals involving a limitation to avoid bright or fluorescent lights.  He asserts that the vocational expert's initial response—that the number of available jobs would be reduced by 50 percent—was "difficult for her to come by."  Sunshine also points to the vocational expert's subsequent testimony concerning an identical limitation, noting that the vocational expert testified that it would reduce available jobs by only 25 percent.  He asserts that

the two answers are inconsistent and confusing, and the ALJ erred in relying on the latter testimony.

In response to the ALJ's hypotheticals, the vocational expert testified about the number of available jobs in the economy. During the claimant's attorney's examination of the vocational expert, she asked about the effect of an added limitation of a worker needed to avoid bright or fluorescent lights. The vocational expert responded that such a limitation would reduce the available jobs by 50 percent in both New Hampshire and nationally.

The ALJ subsequently questioned the vocational expert regarding the effect of a limitation of a worker needing to wear sunglasses or a visor in the workplace, essentially repeating with different language the limitation posed by the claimant's attorney.[7] The vocational expert clarified her answer, explaining that the limitation would reduce the available jobs in New Hampshire and nationally by 25 percent. The vocational expert apologized for the inconsistency, noting that the questioning had gotten confusing because of the many

---

[7] In the ALJ's RFC assessment, he included a limitation that Sunshine must "avoid fluorescent lights or wear sunglasses in the workplace." Admin Rec. at 35. The parties appear to agree that a limitation that a worker avoid bright or fluorescent lights, and a limitation that a worker need to wear sunglasses or a visor, is the same limitation.

hypotheticals. She then repeated her testimony three times that a limitation of a worker needing to avoid bright or fluorescent lights, or wear sunglasses or a visor in the workplace, would reduce the jobs available in New Hampshire and nationally by 25 percent.

Although the vocational expert asked for clarification about the appropriate hypothetical, her testimony was not inconsistent. The vocational expert explained that she was confused because of the multiple hypotheticals proposed to her, but repeatedly stated that a limitation of needing to avoid fluorescent lights or wear sunglasses in the workplace would reduce the number of available jobs by 25 percent. The ALJ's reliance on such testimony was not improper.[8]

C.   Improper Hypotheticals

Sunshine contends that the ALJ's hypotheticals proposed to the vocational expert failed to take into account all medical

_____

[8] Sunshine also criticizes the vocational expert for not specifying whether the available jobs constituted full-time or part-time work. He does not argue, and the record does not reflect, that the jobs identified by the vocational expert were part-time jobs. Regardless, because Sunshine's counsel failed to raise the issue or object at the hearing, he is precluded from raising that issue here. Jarvis v. Berryhill, No. 16-cv-494-JL, 2018 WL 446658, at *4 (D.N.H. Jan. 17, 2018).

evidence in the record.  He asserts that the ALJ excluded a limitation that the claimant needed to avoid bright and fluorescent lights, despite medical evidence supporting such a limitation.  He also notes that the vocational expert testified that no jobs would be available with a limitation that a claimant could not use his left upper extremity.

The ALJ relied on the vocational expert's responses to hypothetical questions that accurately reflected Sunshine's limitations as found in the RFC assessment.  Although the ALJ initially proposed a hypothetical that did not contain the bright lights limitation, he added that limitation to a subsequent hypothetical, and the vocational expert testified that it would reduce the available jobs by 25 percent.  The ALJ included that limitation in his RFC, and reduced the available jobs by 25 percent, citing the vocational expert's testimony. See Admin. Rec. at 35.

Although the ALJ did not include a limitation in his hypotheticals regarding lack of use of a left upper extremity, that limitation was not included in the ALJ's RFC assessment. As discussed, that assessment is supported by substantial evidence.  Therefore, the ALJ committed no error.

**CONCLUSION**

For the foregoing reasons, the claimant's motion to reverse and remand (doc. no. 7) is denied.  The Acting Commissioner's motion to affirm (document no. 10) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 29, 2018

cc:  All Counsel of Record